UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JESSE CHRISTOPHER MASON, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. |
| ) | 22-10188-FDS |
| v. ) | |
| ) | |
| KILOLO KIJAKAZI, Acting Commissioner, ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION
FOR ORDER REVERSING THE COMMISSIONER'S DECISION AND DEFENDANT'S
MOTION FOR ORDER AFFIRMING THE COMMISSIONER'S DECISION**

**SAYLOR, C.J.**

This is an appeal from the final decision of the Commissioner of the Social Security Administration denying an application for supplemental security income ("SSI") benefits. Plaintiff Jesse Christopher Mason alleges that he became disabled on January 1, 2006, after various impairments rendered him unable to work. He submitted medical records indicating that he suffers from various ailments, including degenerative disc disease, Arnold-Chiari malformation, major depressive disorder, generalized anxiety disorder, post-traumatic stress disorder ("PTSD"), neurodevelopmental disorder, bilateral occipital neuralgia, migraine headaches, idiopathic myalgia and arthralgia, and obstructive sleep apnea. He now disputes the Commissioner's holding that he is not "disabled" within the meaning of the Social Security Act.

Pending before the Court is Mason's appeal and the Commissioner's motion to affirm. For the reasons stated below, Mason's motion to reverse and remand will be granted and the Commissioner's motion to affirm will be denied.

## I.     Background

The following is a summary of the evidence as set forth in the administrative record ("A.R.").

### A.     Educational and Occupational History

Jesse Christopher Mason was born on January 5, 1970, and is currently 53 years old. (A.R. 129). He was 35 years old at the alleged onset of his disability on January 1, 2006. (*Id.*).[1]

Mason has a GED. (*Id.* at 159). He last worked in 2017 as a laborer, off and on, for a couple of months. (*Id.* at 41). Before 2017, he last worked in approximately 2005 or 2006 as a laborer for a private contractor. (*Id.* at 41, 159). He has not worked a full-time job since he was in his thirties. (*Id.* at 42).

### B.     Medical History

Mason alleges that he is unable to work due to various physical and mental-health impairments. (*Id.* at 158).

Dr. Kyle J. Johnson, D.O., a primary-care physician, began treating Mason in December 2018. (*Id.* at 254). At that first visit, Mason reported having intermittent dizzy spells and headaches for the past year due to an Arnold-Chiari malformation. (*Id.*).[2] He also reported a

---

[1] The Application Summary for Supplemental Security Income in the administrative record states that Mason filed his application on March 18, 2019. (A.R. at 129). However, the ALJ stated that Mason "protectively" filed his application on February 25, 2019, and the Initial Disability Determination and Reconsideration Disability Determination also stated that the application date was February 25, 2019. (*Id.* at 20, 68, 83). The date a written statement is received, mailed, or signed will "protect" the plaintiff's filing date—that is, it will be used as the application filing date—if the conditions under 20 C.F.R. § 416.340 are met. Thus, it appears that Mason was entitled to a protective filing date of February 25, 2019.

[2] Chiari malformations are structural defects where the lower part of the brain protrudes into the spinal canal; the term Arnold-Chiari malformation is specific to Type II malformations, which involve both the cerebellum

history of depression and anxiety, and wanted to restart taking venlafaxine, an anti-depressant, which had previously worked well for him. (*Id.*).[3] Dr. Johnson prescribed venlafaxine and referred him to a neurosurgeon for an evaluation for his Arnold-Chiari malformation. (*Id.* at 257).

On February 7, 2020, Mason saw Dr. Hagen Yang, M.D., a neurologist, for recurrent loss of consciousness. (*Id.* at 292). He reported that he was unaware of how often he was losing consciousness or fainting; that he was having severe headaches, neck pain, and numbness in both hands and feet; that he had been experiencing constant dizziness since 2015; and that he had been previously diagnosed with Arnold-Chiari malformation. (*Id.* at 293). He also reported having a craniotomy in 2012 and experiencing some improvement in neck pain and numbness for about a year; however, the symptoms had returned, and he had intractable neck pain and headaches. (*Id.*). He reported that he had previously been prescribed amitriptyline for pain relief, but it had not helped, and that he had been taking gabapentin since October 2019. (*Id.*).

On August 3, 2020, Mason was treated by Dr. Paul G. Mathew, M.D., a neurologist, for headaches. (*Id.* at 417-18). He reported his baseline pain as moderate at 6/10 and stated that he had daily disabling peaks. (*Id.* at 418). Dr. Mathew noted that the headaches involved photophobia, phonophobia, nausea, vomiting, and cutaneous allodynia. (*Id.*). Position changes, physical activity, coughing, and sneezing tended to worsen his headaches, while retreating to a dark, quiet room to lie down helped to stabilize them. (*Id.*). Mason also reported that he experienced some tingling in the extremities, which tended to be positional. (*Id.*). He also

---

and brain stem tissue pushing into the foramen magnum. *See* National Institute of Neurological Disorders and Stroke, NINDS Chiari Malformations Information Page, at https://www.ninds.nih.gov/health-information/disorders/chiari-malformations (last reviewed April 27, 2023).

[3] Mason reported that he had stopped taking the medication during his then-recent move (in July 2018) from Florida to Massachusetts. (A.R. at 254).

3

reported that he had pain that starts in the skull base and radiates toward the apex lasting seconds at a time. (*Id.*). Those pains could be triggered by contact to the skull base and certain neck movements. (*Id.*). Dr. Mathew diagnosed chronic migrainous headache compounded by occipital neuralgia, chronic neck pain, and sleep apnea. (*Id.* at 419). To treat the occipital neuralgia, Dr. Mathew performed an occipital nerve block on August 10, 2020; however, Mason reported that it did not help with the pain. (*Id.* at 415, 404). Dr. Mathew performed another occipital nerve block on January 4, 2021. (*Id.* at 365-68).

Mason has also been treated with psychotherapy for most of his life. (*Id.* at 264). On October 16, 2019, behavioral-health providers worked with Mason to develop a treatment plan. (*Id.* at 346-49). His behavioral-health providers included Dr. Gregory A. Acampora, M.D., a psychiatrist; Patricia A. Long, RNCS, a clinical nurse; and Michael P. Cascio, LICSW, a clinical social worker. (*Id.*). Mason was being treated for major depressive disorder, generalized anxiety disorder, and PTSD. (*Id.* at 346). As part of his treatment plan, he participated in teletherapy sessions with Michael P. Cascio and took citalopram and prazosin for anxiety, depression, and PTSD. (*Id.* at 298-354).[4] He was still receiving mental-health treatment as of January 19, 2021. (*Id.* at 451-55).[5]

C.  **Additional Medical Examinations or Opinions**

On May 14, 2019, Dr. M. Douglass Poirier, M.D., performed a physical residual functional capacity ("RFC") assessment. (*Id.* at 61-63). As to Mason's exertional limitations, Dr. Poirier concluded that he could occasionally lift and/or carry 20 pounds; frequently lift

---

[4] It appears that Mason was prescribed citalopram, an anti-depressant, in lieu of venlafaxine at some point in early 2020. (*See id.* at 446).

[5] According to the treatment notes, the January 19, 2021 teletherapy visit was Mason's twentieth therapy session with Michael P. Cascio. (*See id.* at 452).

and/or carry ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; and sit for a total of about six hours in an eight-hour workday. (*Id.* at 62). Overall, for his exertional limitations, Dr. Poirier concluded that activities of daily life were "generally independent, but with pain." (*Id.*). As to his postural limitations, Dr. Poirier concluded that he could occasionally stoop. (*Id.*). As to his manipulative limitations, Dr. Poirier concluded that he was limited in reaching in any direction. (*Id.* at 63).

On June 10, 2019, Dr. John C. Fahey, Ph.D., performed a psychological evaluation of Mason. (*Id.* at 263-66). Dr. Fahey indicated that Mason was suffering from PTSD; major depressive disorder, recurrent, mild; panic disorder with agoraphobia; alcohol dependence; and opiate dependence. (*Id.* at 264). He reported that "Mr. Mason has been involved in psychotherapy for most of his life, but is not in therapy now." (*Id.*). He noted that Mason has panic attacks routinely, "is anxious most of the time," "is depressed an[d] anhedonic," and "is not in therapy but does take an antidepressant with his doctor." (*Id.* at 266). He concluded that "Mr. Mason is likely to struggle with interpersonal relations where he is avoidant and guarded. His frustration tolerance is limited. His capacity with highly complex or abstract work will also be limited. Mr. Mason will struggle to initiate and sustain tasks. His pacing will be low." (*Id.*).

On July 31, 2019, Dr. Celeste N. Derecho, Ph.D., performed an evaluation of Mason. (*Id.* at 60). Dr. Derecho concluded that he was moderately limited in his ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage himself. (*Id.*). Overall, she opined that Mason performs activities of daily life with "many limitations because [his] neck and back are stiff" and that he "can pay bills, count change, travel independently, [and] shop[] independently." (*Id.*).

5

Dr. Derecho also performed a mental RFC assessment of Mason. (*Id.* at 63-66). As to his understanding and memory, she concluded that he was moderately limited in his ability to understand and remember detailed instructions. (*Id.* at 64). As to his sustained concentration and persistence, she concluded that he was moderately limited in his ability to carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; and complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*). As to his social interactions, she concluded that he was markedly limited in his ability to interact appropriately with the general public. (*Id.* at 65). As to his ability to adapt, she concluded that he was moderately limited in his ability to respond appropriately to changes in the work setting. (*Id.*). Dr. Derecho concluded her assessment with "[e]xpect limitations above based on psych." (*Id.*).

On May 7, 2020, Dr. Robin Tapper, M.D., performed a physical RFC assessment of Mason. (*Id.* at 76-78). She determined that he was limited in the same activities that Dr. Poirier had identified, with two additional limitations. (*Id.*). As to his postural limitations, she concluded that he should also avoid climbing ladders, ropes, and scaffolds given his recurring syncopal episodes. (*Id.* at 77). She also concluded that he had environmental limitations and should avoid concentrated exposure to hazards. (*Id.* at 77-78). Overall, Dr. Tapper agreed with Dr. Poirier's assessment but added seizure/syncope precautions. (*Id.* at 78).

On May 8, 2020, Dr. Michael Maliszewski, Ph.D., performed an evaluation of Mason and performed a mental RFC assessment. (*Id.* at 73-75, 78-80). He concluded that Mason was

6

limited in the same activities and to the same degree as Dr. Derecho had previously identified. (*Id.* at 74, 79-80).

### D. Hearing Testimony

Mason testified by telephone at a remote hearing before the Administrative Law Judge, which was held on February 10, 2021. (*Id.* at 33-53). He stated that he is unable to work because of his body. (*Id.* at 42). He testified that he has Arnold-Chiari malformation and has "bad headaches and dizzy spells because of it." (*Id.*). He also testified that he cannot get his neck "into any situation where it does not hurt." (*Id.* at 43). He stated that he cannot sit down or stand up "for too long" and that his lower back is "really, really bad." (*Id.*). He noted that his PTSD and anxiety are "very bad" and that he "ha[s] sleep apnea, which is not that great." (*Id.*). He indicated that he had a nerve block for his headaches in January 2021 and that it helped "a little bit" with the pain that shot up to the top of his head, but that his neck is still "really stiff." (*Id.*). He also noted that he has colitis and "need[s] to be around a bathroom at all times." (*Id.* at 44). He spoke of being in constant pain and testified that when he does something small, he knows that he will regret it for the next few days. (*Id.*). He indicated that he is on three milligrams of prazosin for his PTSD-associated nightmares and that it helps "a little bit." (*See id.* at 43-45).

As to his daily activities, Mason testified that he gets up around 6:00 a.m., makes a cup of coffee, and then wakes up his daughter. (*Id.* at 48). He stated that he gets her ready, walks her to the bus, and then takes a ride to the methadone clinic. (*Id.*). He testified that after his session at the methadone clinic, he sees if there is anything that is not strenuous that he can do to help the people who work at the shelter. (*Id.*).

The ALJ asked the vocational expert if there were any jobs in the economy for

someone who had the physical capacity for light work and who would be unable to climb ropes, ladders, or scaffolds; could only occasionally stoop and reach overhead; would have to avoid workplace hazards; would only be able to understand, remember, and carry out simple and routine instructions; could maintain concentration only on simple tasks for periods of two hours over an eight-hour workday and a 40-hour workweek; could interact occasionally with coworkers, supervisors, and the public; and could adapt to simple workplace changes. (*Id.* at 50). The vocational expert testified that there were the following jobs available in the economy: cleaner/housekeeping work, routing clerk, and photocopying machine operator. (*Id.* at 50-51).

### E. Procedural History

On March 18, 2019, Mason applied for SSI benefits, alleging that he became disabled on January 1, 2006. (*Id.* at 129). The Commissioner denied his claim both initially on August 19, 2019, and upon reconsideration on June 2, 2020. (*Id.* at 84-86, 89-91). Thereafter, Mason filed a written request for a hearing on August 3, 2020. (*See id.* at 92-94). The hearing was held on February 10, 2021. (*Id.* at 33-53). Mason appeared remotely and testified at the hearing. (*Id.*). Dale Pasculli, a vocational expert, also testified at the hearing. (*Id.*).

On March 31, 2021, the ALJ concluded that Mason was not disabled. (*Id.* at 17-29).

Mason requested a review of the ALJ's decision. (*Id.* at 126-28). On December 1, 2021, the Appeals Council declined to review the decision and adopted it as the final decision of the Commissioner. (*Id.* at 1-3). This appeal followed.

## II.     Analysis

### A.     Standard of Review

Under the Social Security Act, this Court may affirm, modify, or reverse the final decision of the Commissioner, with or without remanding the case for a rehearing.  42 U.S.C. § 405(g).  The Commissioner's factual findings, "if supported by substantial evidence, shall be conclusive," *id.*, because "the responsibility for weighing conflicting evidence, where reasonable minds could differ as to the outcome, falls on the Commissioner and his designee, the ALJ." *Seavey v. Barnhart*, 276 F.3d 1, 10 (1st Cir. 2001) (citation omitted); *see Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 143-44 (1st Cir. 1987).  Therefore, "[j]udicial review of a Social Security claim is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." *Ward v. Commissioner of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).

However, the Court may reverse or remand the ALJ's decision if the ALJ ignored evidence or made legal or factual errors.  *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) ("The ALJ's findings . . . are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."); *Moore v. Astrue*, 2013 WL 812486, at *2 (D. Mass. Mar. 2, 2013) ("[I]f the ALJ made a legal or factual error, the Court may reverse or remand such decision . . . ." (citation omitted)).  Accordingly, if the "ALJ failed to record consideration of an important piece of evidence that supports [the claimant's] claim and, thereby, left unresolved conflicts in the evidence, [the] Court can not conclude that there is substantial evidence in the record to support the Commissioner's decision." *Nguyen v. Callahan*, 997 F. Supp. 179, 183 (D. Mass. 1998); *see also Crosby v. Heckler*, 638 F. Supp. 383, 385-86 (D. Mass. 1985) ("Failure to provide an adequate basis for the reviewing court to determine whether the

administrative decision is based on substantial evidence requires a remand to the ALJ for further explanation."). Questions of law are reviewed de novo. *Seavey*, 276 F.3d at 9.

### B.  Standard for Entitlement to SSI Benefits

In order to qualify for SSI, the claimant must demonstrate that he or she is "disabled" within the meaning of the Social Security Act. 42 U.S.C. §§ 1382(a)(1), 1382c(a)(3) (setting forth the definition of "disabled" in the context of SSI). "Disability" is defined, in relevant part, as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The impairment must be severe enough to prevent the claimant from performing not only past work, but any substantial gainful work existing in the national economy. 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.960(c)(1).

The Commissioner uses a sequential five-step process to evaluate whether a claimant is disabled. *See Mills v. Apfel*, 244 F.3d 1, 2 (1st Cir. 2001); 20 C.F.R. § 416.920. Those steps are:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had . . . a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey*, 276 F.3d at 5; *see* 20 C.F.R. § 416.920(a)(4). "The applicant has the burden of production and proof at the first four steps of the process," and the burden shifts to the Commissioner at step five to "com[e] forward with evidence of specific jobs in the national economy that the applicant can still perform." *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir.

2001). At that juncture, the ALJ assesses the claimant's RFC in combination with the vocational factors of the claimant's age, education, and work experience, to determine whether he or she can engage in any kind of substantial gainful work which exists in the national economy. 20 C.F.R. §§ 416.920(g), 416.960(c).

### C. The Administrative Law Judge's Findings

In evaluating the evidence, the ALJ followed the established five-step procedure set forth in 20 C.F.R. § 416.920(a)(4).

At step one, the ALJ found that Mason had not engaged in "substantial gainful activity since February 25, 2019, the application date." (A.R. at 23).

At step two, the ALJ addressed the severity of Mason's impairments. He concluded that Mason has the following severe impairments: degenerative disc disease, Chiari malformation, major depressive disorder, generalized anxiety disorder, PTSD, neurodevelopmental disorder, bilateral occipital neuralgia, migraine, idiopathic myalgia and arthralgia, and obstructive sleep apnea. (*Id.*). Those impairments significantly limited his ability to perform basic work activities as required by SSR 85-28. (*Id.*).[6]

At step three, the ALJ found that those severe impairments, or their combination, did not meet or medically equal the severity of the requirements of a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*). The ALJ stated that Mason's "mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06, 12.11, and 12.15" and noted that, "[i]n making [that] finding, the undersigned has considered whether the 'paragraph B' criteria [were] satisfied." (*Id.*).

---

[6] The ALJ noted that while Mason also suffers from hepatitis C infection and opiate dependence, neither of those conditions were severe impairments. (*Id.* at 23). The ALJ appears to have come to that conclusion based on information indicating that Mason's positive hepatitis C result reflected a prior exposure, and that his opiate dependence was in remission. (*Id.* at 361, 23).

11

"To satisfy the paragraph B criteria, [the] mental disorder must result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning." 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00 Mental Disorders. Those four areas are: "[u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." (*Id.*).

The ALJ concluded that the "paragraph B" criteria were not met because Mason had only a moderate limitation for understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing himself. (A.R. at 23-24). In addition, the ALJ found that he did not satisfy the "paragraph C" criteria because the "evidence fail[ed] to establish" that criteria. (*Id.* at 24).

At step four, the ALJ determined that Mason did not have any past relevant work under 20 C.F.R. § 416.965. (*Id.* at 27); *see also* 20 C.F.R. § 416.965(a) ("We do not usually consider that work you did 15 years or more before the time we are deciding whether you are disabled applies.").

After consideration of the record, the ALJ concluded that Mason had the residual functional capacity to perform light work except he cannot climb ropes, ladders, or scaffolds and can only occasionally stoop. (A.R. at 24). He has the ability to understand, remember, and carry out simple and routine instructions. (*Id.*). He can maintain concentration on simple tasks for periods of two hours for an eight-hour workday and a 40-hour workweek. (*Id.*). He can only interact occasionally with coworkers, supervisors, and the public. (*Id.*). He can only adapt to simple workplace changes. (*Id.*).

In making that finding, the ALJ followed a two-step process. (*Id.*). First, he considered whether there were underlying medically determinable physical or mental impairments—that is,

12

impairments that could be shown by medically acceptable clinical or laboratory diagnostic techniques—that could reasonably be expected to produce Mason's pain or other symptoms. (*Id.* at 24-25). Second, he evaluated the intensity, persistence, and limiting effects of those symptoms to determine the extent to which they limited his work-related activities. (*Id.* at 25). For that purpose, whenever statements about those symptoms were not substantiated by objective medical evidence, the ALJ considered other evidence in the record to determine if the symptoms limited his ability to do work-related activities. (*Id.*).

At the first step of the two-step process, the ALJ determined that Mason's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (*Id.*). However, at the second step of the two-step process, he found that his statements about the intensity, persistence, and limiting effects of his symptoms were not consistent with the medical evidence and other evidence in the record. (*Id.*). Specifically, the ALJ found that his statements were inconsistent with the fact that he indicated that he can perform his personal care each day, microwave one meal a day, go out once a day, shop for food twice a month, pay his bills, walk a quarter of a mile before resting, pay attention for five minutes, and take care of his daughter, who lives with him in a shelter. (*See id.*).

In making those determinations, the ALJ stated that he did not defer to or give any specific evidentiary weight, including controlling weight, to any prior administrative medical findings or medical opinions. (*Id.* at 27). He noted that he found the limitations given by Dr. Tapper for the B criteria of the listings "persuasive in view of the claimant's adult function report and testimony." (*Id.*). He also found Dr. Fahey's report "persuasive in view of the fact that the claimant had testified that he is not under any mental health treatment currently." (*Id.*). He stated that Dr. Mathew noted that Mason was having constant daily headaches and diagnosed

him with right occipital neuralgia. (*Id.* at 26). Overall, he found that the residual functional capacity assessment was supported by the conclusions of Dr. Tapper, Dr. Fahey, and Dr. Mathew, and that their conclusions were supported by the medical evidence. (*Id.* at 27).

At step five, the ALJ considered Mason's age, education, work experience, and RFC. Taking all of those factors into account, the ALJ found that a significant number of jobs existed in the national economy that he could perform. (*Id.* at 28); *see also* 20 C.F.R. §§ 416.969, 416.969a. To determine the extent to which Mason's limitations impeded his ability to perform unskilled light work, the ALJ asked the vocational expert whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and RFC. (A.R. at 28). The vocational expert testified that a person with Mason's characteristics could work in representative occupations such as a cleaner/housekeeping worker, a routing clerk, or a photocopy machine operator. (*Id.*). The ALJ concluded that after considering Mason's characteristics, he could make a successful adjustment to work that exists in significant numbers in the national economy, and that Mason was not disabled within the meaning of the Social Security Act. (*Id.* at 28-29).

### D. Mason's Objections

Mason raises two main objections to the ALJ's determination that he is not disabled: (1) that the ALJ ignored evidence of his pain in his ability to work and (2) that the ALJ ignored evidence concerning his mental-health treatment.

#### 1. Evidence of Mason's Ability to Work with Pain

Mason first contends that the ALJ did not appropriately evaluate the role of his pain in his ability to work.

In assessing a claimant's complaints of pain, an ALJ must first find a "medically

determinable impairment that could reasonably be expected to produce [the] symptoms, such as pain." 20 C.F.R. § 416.929(b). If a claimant meets that threshold, as Mason did here, the ALJ must next evaluate the extent to which "the intensity and persistence of [the] symptoms, such as pain," limit the individual's capacity for work. 20 C.F.R. § 416.929(c). That step requires assessing whether the claimant's statements concerning his symptoms are consistent with objective medical evidence and other evidence. SSR 16-3p. In addition, because the claimant's symptoms can result in a more severe impairment than what is reflected by the objective medical evidence alone, the ALJ should consider the following factors to assess the consistency of an individual's statements:

> (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the individual's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any pain medication; (5) treatment, other than pain medication, the claimant has received for relief; (6) any measures the claimant has used to relieve pain or other symptoms; and (7) other factors concerning the claimant's limitations and restrictions due to pain or other symptoms.

*Id.*; 20 C.F.R. § 416.929(c)(3).

Similarly, in assessing a claimant's statements, an ALJ should not reject subjective allegations of pain solely because they are inconsistent with the medical record. *Pires v. Astrue*, 553 F. Supp. 2d 15, 22-23 (D. Mass. 2008); *see also* SSR 16-3p ("[W]e will not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual."); *Valiquette v. Astrue*, 498 F. Supp. 2d 424, 433 (D. Mass. 2007) ("[S]ome dissonance between the objective medical assessments and the plaintiff's description of the level of pain he was experiencing . . . merely poses the question of the credibility of his subjective complaints, it does not answer it.").

However, if the ALJ finds that the claimant's testimony concerning his pain is not credible, "the ALJ must make specific findings as to the relevant evidence he considered in determining to disbelieve the [claimant]." *Da Rosa v. Sec'y of Health & Human Servs.*, 803 F.2d 24, 26 (1st Cir. 1986); *see also* SSR 16-3p ("The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.").

Here, the ALJ found that Mason's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (A.R. at 25). Mason contends that the ALJ did not properly evaluate the role of his pain in his ability to work. (Pl.'s Mem. at 8). Specifically, he asserts that the ALJ failed to consider the *Avery* factors when evaluating the effect of his pain on his ability to work. (*Id.* at 8-9 (citing *Avery v. Sec'y of Health & Human Servs.*, 797 F.2d 19, 28-29 (1st Cir. 1986))). Those factors are (1) the nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) precipitating and aggravating factors; (3) type, dosage, effectiveness, and adverse side effects of any pain medication; (4) treatment, other than medication, for relief of pain; (5) functional restrictions; and (6) the claimant's daily activities. *Avery*, 797 F.2d at 29; *see also* 20 C.F.R. § 416.929(c)(3); SSR 16-3p.

The ALJ did not explicitly cite the *Avery* or regulatory factors used to evaluate Mason's subjective complaints of pain in deciding that his claims were not consistent with the medical evidence and other evidence of record. (*See* A.R. at 25). However, the ALJ was not required to do so. *See Deforge v. Astrue*, 2010 WL 3522464, at *9 (D. Mass. Sept. 9, 2010) ("[T]he ALJ was not required to demonstrate specific consideration of each of the *Avery* factors in his

decision, so long as the record as a whole shows that he considered them." (citing *Cox v. Astrue*, 2009 WL 189958, at *10 (D. Mass. Jan. 16, 2009))). In any event, all of those factors were, in substance, discussed and considered during the hearing.

First, Mason testified about his daily activities. (A.R. at 47-48). He testified that he gets up around 6:00 a.m., makes a cup of coffee, and then wakes up his daughter. (*Id.* at 48). He also stated that he gets his daughter ready, walks her to the bus, and then takes a ride to the methadone clinic. (*Id.*). He testified that after the methadone clinic, he sees if there is anything that is not strenuous that he can do to help the people who work at the shelter. (*Id.*).

Second, Mason testified about the location, duration, frequency, and intensity of his pain. (*Id.* at 42-44). He stated that he has bad headaches and dizzy spells because of an Arnold-Chiari malformation. (*Id.* at 42). He testified that he cannot get his neck into any situation where it does not hurt and that his lower back is "really, really bad." (*Id.* at 43). He also testified that he cannot do anything without being in constant pain. (*Id.* at 44).

Third, as to precipitating and aggravating factors, Mason testified that when he does something small like sweeping or mopping, he cannot move for the next four days. (*Id.* at 42).

Fourth, Mason testified about the medication he was taking. He stated that he was on citalopram, gabapentin, and methadone and that the dosage of one of his medications was recently increased because his PTSD-related dreams were beginning to recur. (*See id.* at 43-45).

Fifth, as to alternatives to medications, the ALJ questioned Mason about his January 2021 nerve-block procedure. (*Id.* at 43). He testified that the procedure helped his pain "a little bit," but that his neck was still "really stiff." (*Id.*).

Sixth, Mason also testified about his limitations and restrictions due to pain or other symptoms. (*Id.* at 42-44). He stated that due to herniated discs in his lower back, he cannot

17

sweep up without it starting to bother him. (*Id.* at 42). He testified that he cannot sit or stand up for too long. (*Id.* at 43). He stated that he has colitis and needs to be near a bathroom at all times. (*Id.* at 44).

Accordingly, under the circumstances, the Court finds that the ALJ adequately explored the *Avery* factors during the administrative hearing and reversal is not warranted on that basis.

### 2. Evidence Concerning Mason's Mental-Health Treatment

Mason also contends that the ALJ ignored evidence concerning his mental-health treatment. He asserts that the ALJ did not discuss his mental-health treatment or mention his medication in the hearing decision. Defendant contends that this apparent oversight is not cause for remand and that the ALJ offered multiple reasons for finding that Mason's subjective symptoms were not disabling.

The "substantial evidence" standard is one where "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." *Miranda v. Sec'y of Health, Ed. & Welfare*, 514 F.2d 996, 998 (1st Cir. 1975); *Sousa v. Astrue*, 783 F. Supp. 2d 226, 232 (D. Mass. 2011). Accordingly, the ALJ must review all the relevant evidence. *See Sousa*, 783 F. Supp. 2d at 232; SSR 16-3p. However, the ALJ is not required to discuss every piece of evidence in the record when making his or her decision. *Santiago v. Sec'y of Health & Human Servs.*, 1995 WL 30568, at *4 (1st Cir. Jan. 25, 1995); *Sousa*, 783 F. Supp. 2d at 234 ("The hearing officer is not required to—nor could he reasonably—discuss every piece of evidence in the record."). Moreover, even if one could come to a different conclusion than the ALJ, the question on judicial review is whether substantial evidence supports the ALJ's decision. *Robles v. Barnhart*, 2005 WL 1773963, at *4 (D. Mass. 2005) ("If substantial evidence exists to support the ALJ's determination, the Court must accept his findings as conclusive even if the

record arguably could justify a different conclusion."). A reviewing court may reverse or remand the ALJ's decision when the ALJ ignored evidence or made legal or factual errors. *Moore*, 2013 WL 812486, at *2; *Robles*, 2005 WL 1773963, at *4.

The ALJ found that Mason's "testimony regarding the severity of his condition [was] inconsistent with his statement to Dr. Fahey that he was under no treatment for his mental condition." (A.R. at 26).[7] The ALJ appears to have overlooked the fact, however, that at the time of Dr. Fahey's June 2019 psychodiagnostic interview of Mason—and as noted in Dr. Fahey's report—Mason was taking an antidepressant prescribed by his primary-care physician. (*Id.* at 263-66). Nor did the ALJ acknowledge that Mason has been involved in psychotherapy for most of his life, or that he began a comprehensive mental-health treatment plan in October 2019 and had attended at least 20 therapy sessions by the time of the February 2021 hearing before the ALJ. (*See id.* at 264, 452, 454). The ALJ did acknowledge a note from Michael Cascio, LICSW, dated February 5, 2021, indicating that Mason had been diagnosed with PTSD, anxiety, depression, and substance abuse. (*Id.* at 26).

While the ALJ was not required in his written decision to address every piece of evidence in the record, *Santiago*, 1995 WL 30568, at *4, he may not ignore evidence because it is favorable to a claimant, *see Hamlin v. Colvin*, 199 F. Supp. 3d 247, 269 (D. Mass. 2016). Here, the ALJ failed to address evidence of Mason's past psychotherapy, his prescribed antidepressant, and his resumption of therapy. Accordingly, the Court cannot, on this record, conclude that the ALJ adequately considered Mason's mental-health treatment. Remand is therefore appropriate as to that issue.

---

[7] The ALJ repeated this statement elsewhere in his written decision. (*See id.* at 25 ("Significantly, [Dr. Fahey] noted that the claimant was not currently under any treatment for his mental conditions."); *id.* at 27 ("[T]he undersigned finds that the report of Dr. Fahey is persuasive in view of the fact that the claimant had testified that he is not under any mental health treatment currently.")).

## III.  Conclusion

For the foregoing reasons, plaintiff's motion for an order to reverse and remand the final decision of the Commissioner of the Social Security Administration is GRANTED, and defendant's motion to affirm the action of the Commissioner is DENIED.

**So Ordered.**

Dated:  April 28, 2023

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court